CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
JUL 16 2015
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| RANDY AYRES, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 3:14-CV-00011 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| KYANITE MINING CORP., | ) By: Hon. Glen E. Conrad |
| | ) Chief United States District Judge |
| Defendant. | ) |

This civil action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. It is presently before the court on the parties' motions for summary judgment. For the following reasons, the court will grant the motion for summary judgment filed by Defendant Kyanite Mining Corporation ("Kyanite"), and deny the motion for summary judgment filed by Plaintiff Randy Ayres.

## Factual and Procedural Background

The following facts are taken from the administrative record. See McMurray v. AGC Flat Glass N.A., No. 2:09CV00077, 2010 WL 3155993, at *2 (W.D. Va. Aug. 10, 2010) (noting that the administrative record provides the "complete factual predicate" for the court's review in ERISA actions such as this one); Docket No. 27 (administrative record).

Ayres worked for Kyanite from February 1988 until February 1999. R. at 135, 169. As a Kyanite employee, Ayres was eligible to participate in the "Kyanite Mining Company Profit Sharing and 401(k) Savings Plan" (the "Plan"), an employee benefit plan that provided for profit-sharing in accordance with its terms. See R. at 1-49 (Plan, as effective April 1, 1997, as amended and restated, with various amendments thereto); R. at 50-131 (Plan, as effective April 1, 2006, as

amended and restated).[1] The Plan maintained a profit sharing account for each participant, to which Kyanite made contributions each year, as determined by the Kyanite Board of Directors in its discretion. R. at 18, 16. The Plan provided that, upon termination of employment, the distributable balance of a participant's account "shall be distributed to the terminated [p]articipant as soon as practicable following the close of the Plan Year in which he terminates employment…" R. at 23-24. The Plan also provided that, in the event of "financial hardship," a participant could receive loans from his vested interest in his profit sharing account. R. at 29-30. Interest was charged on these loans at a rate of prime plus one percentage point. R. at 31.

Under the terms of the Plan, an Administrative Committee ("Committee") is "responsible for the general administration of the Plan and supervision of" the Plan's assets. R. at 6, 35-38, 56, 89-91. The Committee is charged with "constru[ing] and interpret[ing] the Plan and decid[ing] all questions relating to eligibility and payment of benefits;" "mak[ing] a determination as to the right of any person to a benefit;" and requesting and receiving from a participant and Kyanite any information it may "reasonably require to determine…the benefits payable to each [p]articipant." R. at 35, 89. The Committee has discretion "to interpret the terms of the Plan and to decide factual and other questions relating to eligibility for, entitlement to, and payment of benefits. The Committee's reasonable interpretations of the Plan and factual determinations concerning benefit issues are binding on Participants." R. at 90.

While employed at Kyanite, Ayres participated in the Plan and maintained a profit-sharing account, which was held and administered by First Virginia Bank ("First Virginia"), a trustee of the Plan. R. at 135, 141-42. In 1997, Ayres applied for a $7,300.00 loan from his account. In

---

[1] "[A]n ERISA cause of action based on the denial of benefits accrues at the time benefits are denied, and the plan in effect when the decision to deny benefits [was made] is controlling." McWilliams v. Metro. Life Ins. Co., 172 F.3d 863 (4th Cir. 1999) (table), published in full at 1999 WL 64275, at *2 (4th Cir. Feb. 11, 1999).

2

association with this loan, Ayres and his wife completed several forms, including a participant loan application form, a spousal consent form, and a promissory note and security agreement. R. at 157-161. A check was issued for this loan on June 17, 1997. R. at 162 (canceled check). That check was addressed to Ayres's home address, and was reflected as a loan in his profit-sharing account. R. at 151-53.

In 1998, Ayres applied for a $10,500.00 loan from his account, purportedly to fund home renovations. R. at 164. Ayres completed a participant loan authorization form, a statement of "immediate and heavy financial need," a tax withholding form, a spousal consent form, and an installment note. R. at 163-68. The disbursement of this loan was reflected in Ayres's account statements. R. at 152-53. The documents related to this loan reflect the same home address as used to disburse the 1997 loan. The record does not contain a canceled check for this loan, however.

Following the termination of his employment at Kyanite in February 1999, Ayres submitted an "Election Form for Rollover Distributions," signed on February 26, 1999, requesting that all funds in his profit-sharing account be disbursed to him as "taxable distributions," subject to federal and state tax withholdings. R. at 170-71. On April 2, 1999, Kyanite authorized a 100% distribution of Ayres's account, payable to Ayres at the same home address as his prior loans. R. at 170-73. On April 16, 1999, First Virginia sent Ayres a letter confirming the distribution process. R. at 174. This letter explained that the initial proceeds of Ayres's account, less federal and state taxes, were distributed on April 15, 1999, and that a second distribution would be made once the 1999 Plan allocations had been confirmed. Id.

According to Plan records, First Virginia distributed $5,875.26 to Ayres on April 15, 1999, which was calculated by determining 80% of Ayres's account balance as March 31, 1998

3

($30,134.38), and then subtracting the balance of his outstanding promissory notes ($17,134.87), federal taxes ($6,026.87), and state taxes ($1,205.38). R. at 155. On June 23, 1999, First Virginia distributed $7,120.52 to Ayres, which was the gross amount of his remaining balance ($9,369.10), minus federal taxes ($1,873.82) and state taxes ($374.76). R. at 141-42, 156. Ayres's final profit-sharing account statement, for the period from April 1, 1999 to March 31, 2000, reflects that all distributions were made and that the closing balance of his account was zero. R. at 153. The record does not contain canceled checks for these 1999 disbursements.

In or around February 2011, Ayres contacted Kyanite Controller Ron Hudgins, claiming that he never received the 1998 loan or the 1999 distributions from his account. R. at 135. Although Kyanite's records reflected that those transactions had been made, it requested records from BB&T, which had acquired First Virginia in 2003. R. at 134-36. The BB&T representative was unable to locate any records of these transactions, because it maintained records for only seven years. R. at 133. Accordingly, the BB&T representative suggested that Ayres review his own bank statements and tax records to determine whether he had received the disbursements. R. at 133-34. In response, Ayres's wife stated that he had not filed taxes since leaving Kyanite, because he had not been employed. R. at 132. She also stated that Ayres believed "the monies ha[d] been misappropriated somehow." Id.

On April 26, 2011, the Committee discussed Ayres's claim. R. at 138. It mused that, because Ayres had received a W-2 for his employment income from Kyanite in 1999, he likely had to file a tax return for that year. Id. Accordingly, the Committee sent a letter to Ayres, in which it enclosed a form by which he could request his 1999 tax return. R. at 138-39. That letter also stated that "[t]o pay amounts to a participant that audited financials say have already been distributed would unjustly penalize the remaining participants in the [P]lan." Id.

4

On May 17, 2011, the Committee again wrote to Ayres, providing "formal notice of the Committee's decision with respect to [his] claim for benefits and to explain [his] rights in accordance with the claims procedures under the Plan." R. at 141-44. That letter outlined the chronology of events precipitating Ayres's claim, as well as the documentation on which the Committee relied in denying his claim. Id. The Committee emphasized that all of the Plan's records reflected that Ayres had received the amounts owed to him, and stated that it was "not at liberty to disregard the Plan's records and to authorize a payment from the Plan under these circumstances – without any evidence to support [Ayres's] claim." R. at 142. The letter also informed Ayres of his appeal rights, including his ultimate right to file an ERISA action if his appeal was denied. R. at 143-44.

On June 20, 2011, Ayres sent a letter to Kyanite, appealing the denial of his claim. R. at 145. In that letter, Ayres explained that he did not file taxes in 1999, and that his wife's accountant had no records related to the transactions at issue. Id. Ayres also stated that he had contacted the various banks involved and had not been able to obtain any additional information. Id. The Committee considered Ayres's appeal on July 7, 2011, and denied the appeal by letter dated July 20, 2011. R. at 148-49. In that letter, the Committee reiterated that Plan records reflected that the 1998 loan and 1999 disbursements had been paid. Id. The Committee also emphasized that since Ayres had applied for the distributions, he presumably expected to receive the funds; however, he failed to contact Kyanite until more than a decade after he supposedly did not receive them. Id. The Committee considered this delay to be compelling evidence that Ayres had, in fact, received the funds. Id. The Committee's letter informed Ayres that its denial was final, that he could request copies of all relevant documents, and that he had the right to bring an ERISA action. R. at 149.

5

On February 6, 2014, Ayres filed a state-law conversion claim in Albemarle County Circuit Court. Kyanite removed the case to this court based on federal question jurisdiction under ERISA, and then moved to dismiss Ayres's state law claims as preempted by ERISA. See Docket No. 1, 11. On November 14, 2014, the court granted Kyanite's motion and construed Ayres's complaint as stating a claim for relief under Section 502 of ERISA. Docket No. 19. In accordance with the court's scheduling order, the parties submitted cross-motions for summary judgment on February 9, 2015. The motions have been fully briefed, and the court held a hearing on the motions on June 19, 2015. The matter is now ripe for review.

## Discussion

### I. *Standard of Review*

Where, as here, an employee benefit plan provides a fiduciary with discretionary authority to determine whether a claimant is entitled to benefits or to otherwise construe the terms of the plan, a district court reviews the fiduciary's decisions for abuse of discretion only. See Firestone Tire and Rubber Co. v. Brunch, 489 U.S. 101, 110-11 (1989). Thus, in "ERISA actions where the plaintiff is challenging the denial of benefits, summary judgment is 'merely the conduit to bring the legal question before the district court and the usual tests of summary judgment do not apply.'" Keith v. Fed. Exp. Corp. LTD Plan, No. 7:09CV00389, 2010 WL 1524373, at *4 n.4 (W.D. Va. Apr. 15, 2010) (citing Farhat v. Hartford Life & Accident Ins. Co., 439 F.Supp.2d 957, 966 (N.D. Cal. 2006)). The court instead performs a record review to determine, based solely on the record, whether the plan administrator abused its discretion. McMurray, 2010 WL 3155993, at *2.

Under the abuse of discretion standard, "a court will uphold a discretionary determination provided it is reasonable, even if the court would have reached a different conclusion on its own." Keith, 2010 WL 1524373, at *4 (internal citations and quotation marks omitted). "[A] decision is

6

reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Id. (citing Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997)). Substantial evidence is "that which a reasoning mind would accept as sufficient to support a particular conclusion." Id. (citing LeFebre v. Westinghouse Elec. Corp., 747 F.3d 197, 208 (4th Cir. 1984). It requires "more than a mere scintilla of evidence but [] somewhat less than a preponderance." Id.

The Fourth Circuit has identified eight nonexclusive factors that a court should consider in determining the reasonableness of an administrator's discretionary determination. See Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000). Those factors include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Id. Some courts have applied these factors piece-meal, see Wasson v. Media Gen., Inc., 446 F. Supp. 2d 579 (E.D. Va. 2006) (noting in which party's favor each factor weighed), while others have examined the factors holistically to determine whether the plan administrator's decision was the result of a reasoned and principled process supported by substantial evidence. See DuPerry v. Life Ins. Co. of North America, 632 F.3d 860, 869 (4th Cir. 2011).

"[A]n assessment of the reasonableness of the administrator's decision must be based on the facts known to it at the time" the decision was made. Elliott v. Sara Lee Corp., 190 F.3d 601, 608 (4th Cir. 1999) (citation omitted). Accordingly, "the administrative record provides the complete factual predicate for the court's review" of a fiduciary's decision. McMurray, 2010 WL 3155993, at

7

*2. The plaintiff bears the burden of demonstrating, based on the record evidence, that the Committee's decision was unreasonable and not supported by substantial evidence. See Bess v. Mut. of Omaha, No. 2:11-00143, 2011 WL 5858815, at *4 (S.D. W. Va. Nov. 22, 2011).

## *II. Analysis*

Upon reviewing the record in this case, the court believes that the Committee likely did not abuse its discretion in denying Ayres's claim for benefits. The court need not even reach this analysis here, however, because Ayres's claim is barred by the statue of limitations.

ERISA, like many federal statutes, does not contain an express statute of limitations. White v. Sun Life Assurance Co. of Canada, 488 F.3d 240, 245 (4th Cir. 2007). "[C]ourts faced with such omissions borrow the state law limitations period applicable to claims most closely corresponding to the federal cause of action." Id. In Virginia, the most analogous state statute of limitations is the five-year limitations period applicable to claims for breach of written contract. See Karras v. First Colony Life Ins. Co. Pension Plan, No. 6:05CV00031, 2006 WL 1049519, at *3 (W.D. Va. April 13, 2006).This limitations period generally begins to run when a plaintiff may first seek judicial review, after he has exhausted all administrative remedies available under the applicable plan. White, 488 F.3d at 246.

Where, however, a plaintiff does not make a timely claim for benefits, the Fourth Circuit has recognized "an alternative approach," under which the limitations period begins to run at "the time at which some event other than a denial of a claim should have alerted [the plaintiff] to his entitlement to the benefits he did not receive…" Herman v. Lincoln Nat'l Life Ins. Co., 2012 U.S. Dist. LEXIS 77130, at *7 (D. Md. 2012); see Dameron v. Sinai Hosp. of Balt., Inc., 815 F.2d 975, 982 n.7 (4th Cir. 1987) ("The limitation period began running when the plaintiff was notified…that Sinai intended to offset her benefits by an estimate that was greater than the actual amount of Social

8

Security benefits that she was receiving. While she was unaware of the exact reason for the difference…, she was at that point on notice that she should pursue her rights under ERISA.").

In this case, Ayres requested a loan from his profit-sharing account in 1998, purportedly to allow him to make capital improvements to his home. Had Ayres not received those funds, he presumably would have noticed this error in 1998. Likewise, in February 1999, Ayres requested disbursement of the remainder of the funds in his profit-sharing account. The Committee sent several communications to Ayres regarding those disbursements during the first half of 1999. Again, had Ayres not received the funds to which he was entitled, he should have been aware of that in 1999. Ayres was thus on notice that he "should pursue [his] rights under ERISA," with respect to both the 1998 loan and the 1999 disbursements, no later than 1999. However, Ayres failed to contact Kyanite about his claims until 2011 and failed to file this action until 2014 – well over a decade after his funds were allegedly "misappropriated." Ayres's claim is therefore barred by the statute of limitations.

Even if Ayres's complaint was not time-barred, the court could not find that the Committee abused its discretion in denying his claims. The Committee investigated Ayres's claim thoroughly. It reviewed its own audited records, inquired with its trustee bank regarding additional records, and even provided Ayres with a method for obtaining other records himself. The records available to the Committee supported its conclusion that Ayres had received all benefits to which he was entitled. Denying Ayres's claim was a reasonable decision based on the information available.

The court is not persuaded by Ayres's complaint that the Committee's decision was based on an incomplete record lacking evidence like a cancelled check. The limited evidence available in this case directly results from Ayres's own dilatoriness in pursuing his claim. See Watkins v. JPMorgan Chase US Benefits Exec., No. 12-CV-15629, 2013 WL 5913403, at *3 (E.D. Mich. Oct.

9

31, 2013) (rejecting plaintiff's claim that defendant should be faulted for failing to produce a canceled check, because it was plaintiff's "burden to prove that she is entitled to the [] benefit, and her dilatoriness alone is to blame for the fact that the evidence has not been preserved"). The court likewise rejects Ayres's argument that a conflict of interest tainted the Committee's decision here. A structural conflict does exist here, as Kyanite is the payor of benefits and also appoints the members of the Committee. See R. at 36; Metro Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). However, a conflict of interest is "but one among many factors in determining the reasonableness of [the Committee's] discretionary determination." Champion v. Black & Decker (U.S.), Inc., et al., 550 F.3d 353, 359 (4th Cir. 2008); see also Pipenhagen v. Old Dominion Frieght Line, Inc., 640 F.Supp.2d 778, 785 (W.D. Va. 2009) ("[E]ven if the administrator is acting under a conflict of interest," the court "must continue to apply a deferential standard of review while weighing the conflict as a factor in determining whether there is an abuse of discretion.") (internal citations and quotation marks omitted)). As discussed above, the court finds that the Committee's decision was reasoned and principled. The court is not persuaded that the presence of a structural conflict improperly influenced that decision.

## Conclusion

For the reasons stated, the court will grant Kyanite's motion for summary judgment and deny Ayres's motion for summary judgment. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 16th day of July, 2015.

*[signature]*

Chief United States District Judge

10